NO. 25-2607

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

KATHERINE LEA STANFIELD,

Petitioner-Appellant,

v.

JANELL CLEMENT, Warden,

Respondent-Appellee.

---

Appeal From the United States District Court
In the District of Idaho,
The Honorable Raymond E. Patricco, Presiding

---

BRIEF OF RESPONDENT-APPELLEE

---

RAÚL R. LABRADOR
Attorney General of Idaho

L. LaMONT ANDERSON *
Lead Deputy Attorney General
Capital Litigation Unit
Criminal Law Division
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4520
*Attorneys for Respondent-Appellee*

*\* Counsel of Record*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF JURISDICTION............................................................. 1

ISSUES PRESENTED................................................................................. 1

STATEMENT OF THE CASE..................................................................... 2

    Nature Of The Case ............................................................................... 2

    Statement Of Facts, Course of Proceedings ......................................... 2

SUMMARY OF ARGUMENT .................................................................. 16

STANDARD OF REVIEW ........................................................................ 18

ARGUMENT ............................................................................................. 23

    Stanfield Has Failed to Meet Her Burden of Establishing the Idaho
    Supreme Court's Decision Was Based on an Unreasonable Application
    of Supreme Court Precedent ............................................................... 23

    A.    Specific Facts and Testimony Involving Stanfield's Claim ....... 23

    B.    United States Supreme Court Decisions Regarding the
          Confrontation Clause .................................................................. 27

    C.    The Idaho Supreme Court's Decision......................................... 36

    D.    There Is No Clearly Established Supreme Court Precedent to
          Resolve Stanfield's Confrontation Clause Claim....................... 39

    E.    The Idaho Supreme Court's Decision Was Not an Unreasonable
          Application of Supreme Court Precedent ................................... 45

    F.    Any Alleged Error is Harmless................................................... 54

CONCLUSION.......................................................................................... 59

## TABLE OF AUTHORITIES

Cases

*Andrew v. White*, 604 U.S. 86 (2025).................................................................. 42, 43

*Barba v. Montgomery*, 723 Fed. App'x. 431 (9th Cir. 2018)..................................41

*Bell v. Cone*, 535 U.S. 685 (2002) ...........................................................................19

*Brown v. Davenport*, 596 U.S. 118 (2022)...............................................................47

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ......... 17, 30, 31, 32, 33, 35, 36, 39

*Burt v. Titlow*, 571 U.S. 12 (2013) .................................................................... 21, 22

*Carey v. Musladin*, 549 U.S. 70 (2006) ...................................................................39

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007).......................................................22

*Crawford v. Washington*, 541 U.S. 36 (2004) ......... 16, 17, 27, 28, 36, 43, 44, 46, 47

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ....................................................... 19, 35

*Davis v. Ayala*, 576 U.S. 257 (2015).................................................................. 54, 55

*Davis v. Washington*, 547 U.S. 813 (2006) ...................................................... 28, 29, 36

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)........................................................54

*Duhaime v. Ducharme*, 200 F.3d 597 (9th Cir. 2000)....................................... 20, 40

*Fauber v. Davis*, 43 F.4th 987 (9th Cir. 2022) ........................................................40

*Flournoy v. Small*, 681 F.3d 1000 (9th Cir. 2012) ............................................ 40, 41

*Garrett v. Madden*, 859 Fed. App'x. 156 (9th Cir. 2021) .......................................52

*Grim v. Fisher*, 816 F.3d 296 (5th Cir. 2016) ...................................... 40, 41, 50, 51

*Hanson v. Mahoney*, 433 F.3d 1107 (9th Cir. 2006) ................................................1

*Hardy v. Chappell*, 849 F.3d 803 (9th Cir. 2016).....................................................18

*Harrington v. Richter*, 562 U.S. 86 (2011) ................................................. 20, 21, 39

*Hill v. Virga*, 588 Fed. App'x. 723 (9th Cir. 2014) ....................................41

*Howes v. Fields*, 565 U.S. 499 (2012) .....................................................39

*Jenkins v. Hall*, 910 F.3d 828 (5th Cir. 2018) ..........................................51

*Jimenez v. Allbaugh*, 702 Fed. App'x. 685 (10th Cir. 2017)....................52

*Knowles v. Mirzayance*, 556 U.S. 111 (2009)..........................................39

*Lambert v. Blodgett*, 393 F.3d 943 (9th Cir. 2004) ..................................21

*Leavitt v. Arave*, 383 F.3d 809 (9th Cir. 2004)...........................................1

*Lockyer v. Andrade*, 538 U.S. 63 (2003)....................................... 20, 35, 39

*Marks v. U.S.*, 430 U.S. 188 (1977) ..........................................................36

*Maryland v. Craig*, 497 U.S. 836 (1990) ..................................................27

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)................. 29, 30, 35, 36, 37

*Meras v. Sisto*, 676 F.3d 1184 (9th Cir. 2012)..........................................41

*Michigan v. Bryant*, 562 U.S. 344 (2011) ....................................... 29, 30 36

*Miller-El v. Cochrell*, 537 U.S. 322 (2003)...............................................21

*Morales v. Woodford*, 388 F.3d 1159 (9th Cir. 2004)...............................54

*Murray v. Schriro*, 745 F.3d 989 (9th Cir. 2014) .....................................21

*Ohio v. Roberts*, 448 U.S.  (1980)............................................................27

*Panetti v. Quarterman*, 551 U.S. 930 (2007)............................................22

*Payne v. Tennessee*, 501 U.S. 808 (1991) ......................................... 42, 43

*Peters v. Arnold*, 765 Fed. App'x 389 (9th Cir. 2019)..............................41

*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002)......................................22

*Price v. Vincent*, 538 U.S. 634 (2003).......................................................19

*Reed v. May*, 134 F.4th 455 (6th Cir. 2025) ..................................... 41, 43, 46

*Rice v. Collins*, 546 U.S. 333 (2006)...............................................................22

*Rodriguez v. McDonald*, 872 F.3d 908 (9th Cir. 2017)...........................................22

*Shinn v. Kayer*, 592 U.S. 111 (2020)..............................................................20

*Shoop v. Twyford*, 596 U.S. 811 (2022) ........................................................ 18, 21

*Smith v. Arizona*, 602 U.S. 779 (2024)...................................................... 32, 35, 36

*State v. Moore*, 965 P.2d 174 (Idaho 1998) ..................................................57

*Stuart v. Alabama*, 586 U.S. 1026 (2018) ...................................................44

*U.S. v. Harris*, 792 F.2d 866 (9th Cir. 1986)...............................................57

*Washington v. Griffin*, 876 F.3d 395 (2nd Cir. 2017)......................................... 51, 52

*White v. Illinois*, 502 U.S. 346 (1992)......................................................43

*White v. Woodall*, 572 U.S. 415 (2014).....................................................39

*Wildman v. Johnson*, 261 F.3d 832 (9th Cir. 2001)..........................................19

*Williams v. Illinois*, 567 U.S. 50 (2012)........................................................ *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................. 19, 39

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004)...................................................1

*Wood v. Allen*, 558 U.S. 290 (2010).........................................................21

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) .............................................. 20, 39

## Statutes

28 U.S.C. § 636(c)(1).........................................................................1

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 2253.................................................................................1

28 U.S.C. § 2254.................................................................................1

28 U.S.C. § 2254(d) ........................................................................ 18, 22

iv

28 U.S.C. § 2254(d)(1)................................................................. 19, 39

28 U.S.C. § 2254(d)(2)................................................................. 21, 45

28 U.S.C. § 2254(e)(1)..................................................................21

U.S. CONST, amend VI..................................................................27

## Rules

Fed. R. App. P. 4(a)(1)(A) ................................................................1

Fed. R. Evid. 602 .........................................................................45

Fed. R. Evid. 703, comment 1 ..........................................................45

I.R.E. 602 ..................................................................................45

I.R.E. 703 ..................................................................................45

## STATEMENT OF JURISDICTION

Petitioner-Appellant, Katherine Stanfield ("Stanfield"), filed her federal habeas petition ("Petition") on February 11, 2022. 2-(ER-232-38.) Pursuant to 28 U.S.C. § 636(c)(1), both parties consented to have a magistrate conduct all proceedings (SER-3-4), which conferred jurisdiction pursuant to 28 U.S.C. § 2254. *Hanson v. Mahoney*, 433 F.3d 1107, 1111 (9th Cir. 2006). The district court granted a certificate of appealability regarding an alleged violation of the Confrontation Clause. (1-ER-52.) Final judgment was entered on March 28, 2025. (1-ER-2.) Stanfield's timely Notice of Appeal was filed on April 22, 2025. (9-ER-1457.) *See Williams v. Woodford*, 384 F.3d 567, 582 (9th Cir. 2004); Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. *Leavitt v. Arave*, 383 F.3d 809, 815 (9th Cir. 2004).

## ISSUE PRESENTED

Respondent-Appellee, Janell Clement ("State"), wishes to rephrase the certified issue as follows:

> Has Stanfield failed to establish the Idaho Supreme Court's decision regarding her Confrontation Clause claim was based on an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

1

## STATEMENT OF THE CASE

Nature of the Case

Stanfield appeals from the district court's March 28, 2025 Memorandum Decision and Order and Judgment dismissing her Petition.

Statement of Facts and Course of Proceedings

In 2009, Stanfield was operating a daycare out of her house. (7-ER-1243.) During December of that year, she was tending five children (7-ER-1282): her two grandsons, C.D. (6-ER-883) and J.D. (7-ER-1151); W.F who was two-and-a-half years old and the son of Lance Wyatt ("Lance"), Stanfield's daughter's (Stacie) former boyfriend. (6-ER-962-63); and two other young children. (7-ER-1145, 1282).

On December 11, Stanfield called 911 requesting medical assistance for W.F. (4-ER-304-05; 6-ER-962; SER-56-65.) She reported to the dispatcher that when she asked W.F. "to take his coat off" he "threw himself down on the floor and hit his head." (SER-57.) He was "acting weird" and "gasping for air." (SER-58.) After she administered CPR, W.F. had a beating heart but had stopped breathing and was "acting like his eyes aren't there. He's like he's dreamed off into space." (SER-58-59.)

However, prior to calling 911, Stanfield twice called Stacie; the first time she did not answer, but she answered the second time. (7-ER-1232, 1303, 1240-41.) Stacie immediately went to Stanfield's house. (7-ER-1241.)

2

Robin Freeborn was the first paramedic to arrive. (4-ER-353.) No one was doing CPR, and when Freeborn asked Stanfield what happened, she responded, "I don't know, I'm just the baby-sitter." (*Id.*) "[W.F.] was cyanotic, which is a blue, pale in color, and he was not breathing. The breaths were so few a minute that [she] thought that he had been in respiratory arrest, but he was in distress as he took a breath right as [she] reached him." (4-ER-353-54.) There was "a large bump on his forehead," his "pupils were fixed and dilated," meaning "he had a severe either spinal injury or a severe brain injury," and he was "unresponsive." (4-ER-354, 356.)

Stanfield told Freeborn that W.F. had no medical issues, but "is very clumsy. He throws himself down all the time. He trips and falls all the time." (4-ER-354.) Freeborn explained "it was just really hard to get any solid information" from Stanfield regarding what had occurred with her stating, "I don't know. I don't know," even when asked, "[w]hen did this happen." (*Id.*) Ultimately, Stanfield gave Freeborn three different stories. "[T]he initial story was, 'I don't know what happened.' And then the story was, 'Well, he did fall earlier today.' And then the third and final story was, 'Well, when he came home, he threw a fit and threw himself on the ground and held his breath." (4-ER-359.)

Freeborn noticed W.F. had "red marks on his chest," "other bruising in multiple stages" "on his arm, abdomen, and legs" that was "more than usual bruising for a child his age." (4-ER-355.) He also had "red marks over the top of his shoulders

3

on his back" that "appeared to be handprints" "as if he was grabbed from behind." (*Id.*)

Based upon Stanfield's "lack of communication, the stories changing," … and the "delay in contacting EMS or calling 911," Freeborn had her partner, Rene Miller, contact police. (4-ER-355, 359.) Miller confirmed most of Freeborn's observations, Stanfield's different stories, and that Stanfield never said W.F. hit his head on the fireplace. (4-ER-312-14, 321, 323.)

Many of those observations were also seen by firefighters, including Robert Linn, who saw a "splotchy appearance that was different from the rest of [W.F.'s] body" on his chest and "small bruises here and there." (4-ER-326.) He heard Stanfield say "something about that [W.F] throws temper tantrums and holds his breath, throws himself on the floor." (4-ER-326-27.) He agreed that W.F.'s condition was "[s]evere, critical," and that police needed to be contacted. (4-ER-327-28.) Firefighter/paramedic Benjamin also saw bruising on W.F.'s shoulder and chest that "looked like they were finger size." (4-ER-334.)

Firefighter Ho heard Stanfield state that W.F. had two temper tantrums that day. (4-ER-346.) The first at 10:00 a.m. where W.F. fell "in a forward manner to the ground," and the second time he fell backward even though Stanfield wasn't present for that fall. (4-ER-345-46, 348, 350-51.) Firefighter Oldham heard Stanfield say W.F. "is just a clumsy kid." (4-ER-362.) Captain Steward heard Stanfield give

4

inconsistent stories regarding the event. (4-ER-370.) Stanfield told Steward that the first fall "occurred on the step-up from the living room into the kitchen. (4-ER-371.) Discussing the second fall, Stanfield's "original reason was that going from the family room into the dining room, [W.F.] had fallen and hit his forehead. And then the second was, he threw a temper tantrum and hit his head on the floor" "repeatedly" and "intentionally." (4-ER-373.)

Stanfield talked with Parole Officer Dever stating, "[W.F.] threw a tantrum, that he was angry about having a coat on, a winter coat, and being inside, that she had instructed him to remove the coat and he got angry and threw himself down backwards" while she was "reaching and trying to I believe remove his zipper, unzip his coat." (4-ER-376.) Dever had concerns about the statements because Stanfield "did not seem to be affected that this child had been removed from her home by paramedics," expressing concern only for herself. (4-ER-377.)

Officer Adams spoke with Stanfield, who contended that earlier in the day W.F. "had to go potty" while "in the kitchen area, tripped over his pants, fell and hit his head," and the mark on his chin "may have happened at the same time." (4-ER-386.) Addressing the incident that caused her to call 911, Stanfield gave inconsistent statements stating "she saw [W.F.] throw himself back and hit his head. And then the second time she talked about it[,] [s]he had stated that she heard him fall." (4-ER-387.) Stanfield also changed the order of events she gave earlier, stating, "[W.F.]

5

went limp. She noticed that his head, his eyes rolled back. That she started doing CPR. She called 911, and then she called the child's mother." (*Id.*)

Detective Vucinich interviewed Stanfield. During the initial interview, Stanfield made "negative" comments regarding W.F. that led Vucinich to believe that "he is an injury-prone kid, that he has a lot of injuries to his head." (5-ER-553.) She also contended that W.F. "had balance problems [and] would hold his breathe [sic] to a point he would fall over." (*Id.*) She discussed the incident earlier that morning where W.F. received a "bump" on his forehead "because his pants were too long and he tripped on them stepping up into the kitchen area." (5-ER-554.) While she did not disclose any medical issues (5-ER-555), she contended that W.F. "bites his fingers" and "[o]ne of his hands has a bloody finger." (*Id.*) During a second interview, Stanfield pointed out where W.F. fell in the family room where there were no objects upon which he could hit his head (5-ER-550), and where the carpet was "very soft" and "double-padded." (5-ER-559.)

W.F. was transported to the emergency room (4-ER-314) where Dr. Hilvers had already been advised of W.F.'s transport and condition, had contacted Dr. Jansen, a pediatric critical care doctor, and arranged for a CT scan (5-ER-489, 766). When W.F. arrived, Dr. Hilvers had "a bit of a visceral response" based upon the "significant bruising, not only across the face, but just extremities," lack of "any neurologic response," and "extensive bilateral retinal hemorrhages" that all indicated

6

"something acute and catastrophic had occurred." (5-ER-766.) "The most notable bruise" was on the right forehead "just because it was fairly large. It was 2 to 3 centimeters, and it was a little raised and very ecchymotic, meaning black and blue." (5-ER-767.) It took two nurses to document W.F.'s bruises on an injury chart. (5-ER-528-39.) W.F.'s pupils were "fixed and dilated," indicating "a significant intracranial injury, and often associated with increased pressure in the brain that has actually caused enough pressure that you've -- has a palsy of one of the cranial nerves." (*Id.*) While a CT scan revealed "bilateral subdural hematomas," it "did not explain any of the extent of this kid's neurologic impairment," which meant "this isn't something that had been going on for a long period of time." (5-ER-768.) Dr. Hilvers was concerned about "brain stem injury." (*Id.*)

Dr. Jansen confirmed that W.F.'s pupils were "fixed and dilated," was not breathing on his own or responding to pain or touch, and had a "very poor neurological exam, especially the brain stem, which had minimal function at that time. (4-ER-473.) W.F.'s fixed and dilated pupils "represent[ed] more of an advanced state of brain injury, that something bad has happened to the brain stem." (4-ER-474.) Lack of pain response was "another sign of severe brain injury." (4-ER-475.) W.F. also had "extensive areas of retinal hemorrhage in the back of his eye[s]." (4-ER-475-76.) Dr. Jansen explained that the CT results showed no brain swelling, but some bleeding in the frontal part of the brain, which did not correspond with

W.F.'s physical condition, causing Dr. Jansen to conclude "that something was evolving, something had happened more recently. Because this was a very, very bad exam, and yet his scan did not show that evidence." (4-ER-477.) W.F.'s condition worsened, which showed his brain was not working because of his "corneal reflex going away" and his sensor posturing signs that W.F.'s brain was "not functioning as it should." (4-ER-477.)

The next morning, a second CT was ordered, which Dr. Jansen opined was "more in line with [W.F.'s] initial presentation at the hospital" because "[he] had a lot of swelling and not much blood flow to his brain." (4-ER-480.) Because of W.F.'s brain injuries and swelling and/or bleeding, Dr. Jansen consulted with Dr. Cherny, a pediatric neurosurgeon. (4-ER-473; 5-ER-501, 507.)

Dr. Cherny characterized W.F.'s brain injury as "severe." (5-ER-504.) He explained that "[r]etinal hemorrhages are most commonly associated with abusive head trauma," "[a]s opposed to accidental trauma or other forms of trauma." (5-ER-505; *see also* 5-ER-506.) He confirmed that "fixed and dilated pupils are something that come from the brain stem." (5-ER-506.) Dr. Cherny discussed his treatment of W.F. who was "in a very deep coma" and "show[ing] very little signs of neurologic function." (5-ER-507.) The exam was consistent "with very little brain stem function." (*Id.*) He confirmed that W.F. had "extensive bleeding in the retina of the eye" that is associated with abusive head trauma, and was "large enough, extensive

8

enough, and thick enough to be able to be seen on CT. So that would tell you that they're extraordinarily extensive and widespread." (5-ER-509-10.)

He confirmed that the first CT showed "bleeding inside the skull" "that was new, relatively acute, fresh," "located over the top of the head on both sides" some of which "had tracked in between the two sides of the brain, between the two hemispheres of the brain." (5-ER-507.) While the brain "looked relatively normal" because there were no signs of swelling or skull fractures, the scan did not match what Dr. Cherny saw on physical exam or from the neurological testing. (*Id.*)

The second CT "looked dramatically different from the first" because it showed "the brain had lost all normal definition. It was extremely swollen," and "was quite black and looked as if it was either dead or had completely stroked," which was "much more aligned with the way [W.F.'s] exam looked when he first presented." (5-ER-510.) This suggested "the problem and the injury or whatever brought him to the hospital occurred fairly close to the time that he was brought into the hospital." (5-ER-511.) Ruling out other explanations for W.F.'s condition (4-ER-482), Dr. Cherny opined this constellation of injuries was consistent with abusive head trauma, not with W.F. falling or throwing himself and hitting his head on a carpeted surface (5-ER-512-13).

Dr. Jansen also contacted Dr. Sexton, who had a "subspecialty certification as a child abuse pediatrician." (4-ER-473; 6-ER-912-13, 921.) Dr. Sexton spoke with

9

Stanfield and found her discussion of W.F.'s prior behavior and physical abilities inconsistent with records from W.F.'s treating physician, Dr. Schwendiman. (6-ER-922.) Dr. Sexton concluded the physical findings were inconsistent with Stanfield's story. (6-ER-924.) He also saw the retinal hemorrhages that were "bilateral multilayered that extended to the ora serrata that he would not expect in a little child falling over and hitting his head on the floor." (6-ER-924-25.) He discussed the multiple bruises explained the bruises inside W.F.'s knees were in "an unusual location" because they were symmetric on both sides. (6-ER-925.) Dr. Sexton examined both CTs and concluded the second was "distinctly abnormal" because "the brain had lost its normal configuration. There was evidence of swelling in the brain that was causing the brain's normal indentations to even out, as well as losing the ability to tell the layers of the brain." (6-ER-925-26.) Based upon a "high degree of medical certainty," Dr. Sexton opined that W.F. "was the victim of physical abuse" having "suffer[ed] abusive head trauma." (6-ER-928-29.)

Dr. Bell, a neuroradiologist specializing in reading CTs and MRIs (4-ER-412), reviewed the CT scans (4-ER-421) and agreed with Drs. Jansen, Cherny, and Sexton that there was a "catastrophic change" in the second scan based upon "diffuse edema and marked increase in intracranial pressure and herniation" (4-ER-426). Dr. Bell agreed that "minor trauma" would not have caused "this significant degree of catastrophic change" such as "a child falling to the ground" or "from a little toddler

10

angry and throwing himself backwards and hitting himself on the ground." (4-ER-428.) Rather, this was the result of "a violent force that caused this degree of injury with acceleration-deceleration, and rotation, perhaps, of the brain to get something this bad." (*Id.*) Based upon the changes in the second scan, he opined the injury occurred a "couple of hours" before the first scan. (4-ER-429-30.) Dr. Bell also saw retinal hemorrhages that were "amongst the largest [he had] seen in [his] years of practice" (4-ER-427), although he agreed, "that in terms of retinal hemorrhaging questions, [he] would generally defer to an ophthalmologist" (4-ER-434).

Dr. Fishburn, an ophthalmologist (4-ER-395-96), found W.F.'s pupils "very dilated," "would not react to light on direct stimulation," and had "no reflex movement," meaning there was "no sensory input to the brain to reflexively blink the eyelids closed." (4-ER-397.) He also found each eye "had extensive disorganization of the intraocular contents, including … elevation of the retina, various levels of hemorrhage through the retina on each eye," which "shows severe trauma" and "would be a significant form of nonaccidental trauma." (4-ER-397-98.) Dr. Fishburn had never "seen this extensive of a retinal hemorrhaging that was [ ] multilayered" "from a little boy who ha[d] fallen from [ ] 34-1/2 inches" (4-ER-402), and "certainly could be" "a finding of shaken baby syndrome" (4-ER-401).

Dr. Jansen continued to have concerns about W.F.'s survivability because of brain and brain stem injury, resulting in him talking to Lance and conducting a "brain

11

death examination" with Dr. Cherny. (4-ER-481.) Shortly after midnight on December 13, W.F. was taken off life support and passed away. (*Id.*)

Based upon "cumulative signs" that included "bruising, the extensive retinal hemorrhages, the bleeding in his head, the subdural hemorrhages, the progressive brain swelling, … just horrible neurological exam with minimal brain stem function," Dr. Jansen opined that W.F. died from "abusive head trauma." (5-ER-487.) He further opined this constellation of injuries could not be caused by W.F. falling over and hitting his head on a carpeted surface or becoming angry and throwing himself to the ground and striking his head on a carpeted surface. (*Id.*)

Dr. Garrison, a forensic pathologist, conducted the autopsy on W.F.'s body (5-ER-612, 615, 625), and found that he had external and internal signs of injury, a majority of which were "acute" or "recent," including the head injury, some of the bruises, and an abdominal injury (5-ER-629-30). He opined that the subdural hematoma was caused by blunt force trauma at the time W.F. "went down." (5-ER-632.) He also discussed the retinal hemorrhages that were "associated with abusive head trauma as opposed to accidental injury." (5-ER-633.) Dr. Garrison elaborated on the abdominal injury that had a "fresh hemorrhage" as well as an older injury in the same area, which were both "very significant" injuries in a 2½-year old, and was caused by blunt force trauma, not a fall onto a carpeted area or CPR. (5-ER-636-38.) W.F. had bruising under his lip caused by an impact from his teeth that resulted from

12

a "hard slap, punch, whatever you call it, impact injury." (5-ER-638-39.) Dr. Garrison also discussed the bruising on W.F.'s body, many of which raised "red flags." (5-ER-639-44.) Ultimately, Dr. Garrison opined that W.F. was "[a]n abused child" (5-ER-644), who died from "blunt force trauma to the head secondary to the actions of another person," which means "someone else was responsible for the blunt force trauma to the head," and that the manner of death was "homicide" (5-ER-629).

Dr. Garrison removed W.F.'s eyes and sent them to Dr. Crawford, a forensic ophthalmologist (5-ER-628), who examined them (4-ER-441) and found hemorrhages "all the way from the optic nerve here clear out to the periphery where the retina ends.'" (4-ER-444). He had "never seen that … [in] any kind of accidental trauma." (*Id.*) The damage was caused by "acceleration and deceleration forces, and not just one. It takes considerable force, repetitive forces." (*Id.*) The damage involved "every retinal layer," (4-ER-445), and involved a "massive amount of subretinal hemorrhage," which Dr. Crawford had never seen before (4-ER-452). Ultimately, Dr. Crawford opined that his findings were consistent with abusive head trauma, and with 99.9% certainty, opined that it involved "acceleration -- repetitive acceleration-deceleration forces." (4-ER-453.)

After W.F.'s death, Detective Vucinich again interviewed Stanfield and conducted a "reenactment" of what happened to W.F. at her house. (6-ER-791-93.) She again discussed the first fall, contending she asked W.F. to remove his shoes,

told him, "Let's go potty, and that's when he fell" hitting his forehead in the "same spot" he always hit his head because "his pants were too long." (SER-20-21.) She also tried to blame paramedics for the bruising on W.F.'s body and discussed W.F. allegedly having "equilibrium problems." (6-ER-792-93.)

On September 21, 2010, an Indictment was filed charging Stanfield with first-degree murder. (SER-9-10.) After learning she was going to be arrested, Stanfield instructed Lance to "take [his] time" getting to an interview with Detective Vucinich, and that she was going to a hotel to avoid being arrested. (6-ER-970-71.) She even parked her car behind the hotel so "nobody could find her." (6-ER-971.) Stanfield confirmed she went to the hotel because she was "scared that [Vucinich] had told [her she] was facing first degree murder." (7-ER-1313.)

In August 2011, a deputy prosecutor contacted Dr. Rorke-Adams (5-ER-746), a neuropathologist (5-ER-720). Dr. Rorke-Adams reviewed W.F.'s medical records, the autopsy reports, and tissue samples that were prepared at the time of the autopsy, including "remnants of the brain tissue that were still in the preservation solution … so [she] could look directly at the brain and spinal cord and some of the tissue coverings." (5-ER-725.) When Dr. Rorke-Adams began explaining that her technician prepared some slides with beta amyloid staining when she was not present, Stanfield objected based upon hearsay and the Confrontation Clause

14

because Dr. Rorke-Adams did not prepare the slides. (5-ER-725-26.) The objection was overruled. (5-ER-726-27.)

Dr. Rorke-Adams then discussed her report that included the clinical history, why the case was being evaluated, and provided a "gross description" that included several observations regarding W.F.'s body (5-ER-728-29.) She also discussed W.F's CT scans. (5-ER-731.) Ultimately, she discussed amyloid staining that helps to recognize damage to axons, "fibers that are a product of every single nerve cell that we have in our body" and can help "what forces may have been involved in producing the trauma to the brain." (5-ER-732-33.) After her review of the records and her own examinations, Dr. Rorke-Adams came to a final diagnosis that included: (1) "acute cardiorespiratory collapse of previously healthy 31-month old boy": (2) "multiple external injuries"; (3) "tear of ligament of Treitz"; (4) "bilateral acute subdural hematomas"; (5) "bilateral retinal and subretinal hemorrhages and papilledema," and (6) "primary acute deep cerebral, cerebellar brain stem and spinal cord contusions/lacerations with axonal injury, secondary to angular accelerations forces." (5-ER-741.)

Stanfield was found guilty of first-degree murder (SER-8) and given a unified life sentence with a fixed ten years. (SER-5-6). The Idaho Supreme Court affirmed (3-ER-163-83), specifically addressing the merits of her Confrontation Clause claim (3-ER-166-82).

15

Stanfield filed her Petition that included her Confrontation Clause claim. (2-ER-148-50.) The district court denied relief. (1-ER-3-52.) The court agreed with the State that "there is no Supreme Court precedent that has addressed whether a lab technician who merely completes an assigned task by staining tissue on slides is testimonial for purposes of determining whether there is a Confrontation Clause violation." (1-ER-29.) The court further reasoned that "[c]omparing the facts in [Stanfield's] case to the facts in existing Sixth Amendment case law shows that, even if the Idaho Supreme Court's application of the Confrontation Clause *Crawford*[1] factors was erroneous, it was not objectively unreasonable, because the law on what is 'testimony' was unsettled in 2014 and remains unsettled today."

## SUMMARY OF ARGUMENT

Initially, Stanfield's claim fails because there is no clearly established Supreme Court holding that barred Dr. Rorke-Adams from testifying regarding her technician's preparation of the slides and staining of the tissue. Neither *Crawford* nor its progeny bar such testimony, especially considering the fractured nature of the Supreme Court's final Confrontation Clause decision, *Williams v. Illinois*, 567 U.S. 50 (2012) ) (plurality), issued prior to the Idaho Supreme Court's decision. The confusion surrounding *Crawford* and its progeny is particularly demonstrated by the

---

[1] *Crawford v. Washington*, 541 U.S. 36 (2004).

16

numerous federal court decisions, including from this Court, that have opined there is no Supreme Court precedent barring admission of a testifying expert who has used information from a non-testifying technician.

Even if there is clearly established Supreme Court precedent, Stanfield has failed to establish the Idaho Supreme Court's decision was based upon an objectively unreasonable application of that precedent, especially in light of *Williams*, and Justice Sotomayor's concurrence in *Bullcoming v. New Mexico*, 564 U.S. 647, 676 (2011) (Sotomayor, J., concurring). The Idaho Supreme Court meticulously examined *Crawford* and its progeny and reasonably applied those cases to conclude the information from the technician was neither hearsay nor testimonial, especially in light of the factual differences in this case that distinguish it from *Crawford* and its progeny, including how little the technician's information contributed to Dr. Rorke-Adams's opinions.

Finally, Stanfield has failed to establish that any alleged error had a substantial and injurious effect or influence in determining the jury's verdict. The information from the technician related to only one of Dr. Rorke-Adams's six opinions and did not contribute to her ultimate opinion that W.F. died from traumatic brain injury. Her testimony was merely icing on the cake that corroborated six other experts who all concluded W.F. did not die from an accident but was the result of traumatic brain trauma. It also did not affect Stanfield's constantly changing stories and the

17

contradictions to emergency personnel, police, her two grandsons, or other individuals or her attempt to hide from the police after an arrest warrant was issued. It also did not impact the testimony from emergency personnel who saw W.F.'s condition after he was murdered by Stanfield.

## STANDARD OF REVIEW

While a district court's decision to grant or deny a habeas petition is reviewed de novo, that review is tempered by applying the highly deferential standards of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *Hardy v. Chappell*, 849 F.3d 803, 824 (9th Cir. 2016) ("AEDPA revised the standard of review limiting a federal court's review of state court decisions which are 'contrary to, or involved an unreasonable application of, clearly established Federal law.'").

Because habeas relief is restricted by AEDPA, *Shoop v. Twyford*, 596 U.S. 811, 818 (2022), relief can be provided only if the state courts' adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)

18

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meaning. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision is contrary to clearly established federal law, as determined by the United States Supreme Court, if it (1) "applies a rule that contradicts the governing law set forth in our cases," or (2) "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

A state court's decision is an unreasonable application of clearly established federal law, as determined by the Supreme Court, when "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Stanfield must establish the Idaho Supreme Court's application of clearly established federal law, as determined by the United States Supreme Court, was "objectively unreasonable." *Wildman v. Johnson*, 261 F.3d 832, 837 (9th Cir. 2001). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "[E]valuating whether a rule application was unreasonable requires considering the

19

rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"Clearly established" "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Federal courts may use circuit cases to help determine whether Supreme Court law is "clearly established" and whether a state court decision is within the scope of reasonable applications of Supreme Court precedent, but the writ may not be granted because of a conflict with circuit law. *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).

The standard "is difficult to meet," granting authority to issue the writ only in cases "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Shinn v. Kayer*, 592 U.S. 111, 121 (2020) ("The question is whether a fairminded jurist could take a different view."). Stanfield "must show that the state court's ruling on the claim … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. "[AEDPA] reflects the view that habeas corpus is a guard

against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03.

Factual findings fall within two AEDPA provisions, §§ 2254(d)(2) and 2254(e)(1). *Lambert v. Blodgett*, 393 F.3d 943, 971 (9th Cir. 2004). Understanding how §§ 2254(d)(2) and (e)(1) interact has yet to be resolved by the Supreme Court, *Burt v. Titlow*, 571 U.S. 12, 18 (2013), or the Ninth Circuit, *Murray v. Schriro*, 745 F.3d 989, 1001 (9th Cir. 2014). Irrespective of apparent tension between §§ 2254(d)(2) and (e)(1), the Supreme Court has determined "'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)). "[I]f reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Wood*, 558 U.S. at 301 (quotes, citation, ellipsis omitted). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cochrell*, 537 U.S. 322, 340 (2003). "[R]eview of factual determinations under § 2254(d)(2) is expressly limited to the evidence presented in the State court proceeding." *Twyford*, 596 U.S. at 819.

21

This standard also "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," which "was meant to be" because "AEDPA requires a state prisoner to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement." *Titlow*, 571 U.S. at 19-20. A petitioner must show "that the trial court had no permissible alternative but to" reach the opposite conclusion. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The question is not whether the federal court would make a different factual finding, but whether the state court's finding is supported by the record. *Rodriguez v. McDonald*, 872 F.3d 908, 919 (9th Cir. 2017).

When a petitioner overcomes the restrictions imposed by § 2254(d), the claim must be resolved de novo. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even under de novo review, "factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence." *Pirtle v. Morgan*, 313 F.3d 1160, 1168 (9th Cir. 2002). The presumption applies to "express and implied factual determinations by the state trial court and [Idaho] Supreme Court." *Cooper v. Brown*, 510 F.3d 870, 919 (9th Cir. 2007). "Clear and convincing evidence within the meaning of § 2254(e) requires greater proof than preponderance of the evidence and must produce 'an abiding conviction that the factual contentions being advanced are highly probable." *Id.*

22

## **ARGUMENT**

### Stanfield Has Failed to Meet Her Burden of Establishing the Idaho Supreme Court's Decision Was Based on an Unreasonable Application of Supreme Court Precedent

A.      Specific Facts and Testimony Involving Stanfield's Claim

Sometime after completion of his autopsy report, Dr. Garrison requested that a neuropathologist become involved. (5-ER-628.) Dr. Rorke-Adams's first contact from someone in Idaho was by Deputy Prosecutor Guzman in August 2011. (5-ER-746.) In addition to receiving W.F.'s medical records, the autopsy report, tissue samples from the autopsy, Dr. Crawford's report, police reports, and other experts' reports, Dr. Rorke-Adams received "actual remnants of the brain tissue … so [she] could look directly at the brain and spinal cord and some of the tissue coverings." (5-ER-725.) "After these examinations, [she] asked to receive … the paraffin blocks which contained these tissues so that one of the technicians in [her] laboratory could do some additional studies." (*Id.*) She completed "a gross and microscopic examination of the tissue slides that were sent to [her]" and the tissue samples that came from W.F.'s brain and spinal cord. (*Id.*)

When asked if she did the beta amyloid staining, Dr. Rorke-Adams stated, "My technician did, yes," and when Dr. Rorke-Adams was asked what that entailed, Stanfield objected, but the prosecutor was permitted to lay additional foundation. (*Id.*) Stanfield was then asked, "This BAPP staining, did you actually prepare,

23

personally, the slides that were looked at"; Dr. Rorke-Adams responded, "No. My technician did." (5-ER-726.) Dr. Rorke-Adams acknowledged she was not present when the slides were prepared. (*Id.*) When asked if the lab technician did any testing of the tissues, Dr. Rorke-Adams described the "routine procedure in every case when we're doing -- either evaluating a surgical specimen or doing an autopsy is to do the examination of the body, of the tissue. Then we cut the tissue into small pieces so that the technician can prepare the slides." (*Id.*) The tissues are put into formaldehyde and given to the technician, who takes the tissue and prepares it "according to whatever technique we ask for preparation." (*Id.*) Stanfield again objected, but the prosecutor again was permitted to lay additional foundation. (*Id.*)

Dr. Rorke-Adams explained that when the tissues arrived in her office, they were already labeled identifying to whom they belonged, they remained labeled, and, based upon that labeling, she could tell the tissues came from W.F. (*Id.*) She discussed the process used to have the technician complete the staining and slide that included completing a "request sheet" that asked "specifically for that antibody to be applied to the tissue," which is "given to the technician along with the specimen." (5-ER-727.) Once the staining and slide are prepared, the "prepared slide is given to the pathologist along with the sheet ... that we made out asking for that antibody." (*Id.*) A control slide is then examined first "to make certain that the technique was working so that we can rely upon what we're looking at in the unknown slide." (*Id.*)

24

When asked if she could determine whether the technician properly applied the stain, Dr. Rorke-Adams answered affirmatively, explaining, "Because there's always a control slide that goes with it." (*Id.*) The only information provided by the technician was that "she received the tissue, the stain that we requested her to do, and she notes when she did it, and when she handed it back to us." (5-ER-726.)

After the trial court overruled Stanfield's objection (5-ER-727), Dr. Rorke-Adams discussed the contents of her report that began with W.F.'s clinical history (5-ER-728). Based upon her gross examination, she then explained five findings that were "pertinent to the neuropathological evaluation," including: (1) "traumatic injury of the forehead, nose, cheek, chin and lips"; (2) "bilateral acute subdural hematomas" (3) "cerebral edema"; (4) "bilateral diffuse retinal and subdural hemorrhages and papilledema"; and (5) "blunt force trauma of the extremities and abdomen with laceration of the ligament of Treitz." (5-ER-728-29.)

After discussing the two CT scans, abusive head trauma, the relationship between the eyes and the brain, the detachment of W.F.'s retina, retinal hemorrhages, and that she had no complaints about how the autopsy was performed and the samples preserved (5-ER-731), Dr. Rorke-Adams discussed how the amyloid staining that was completed by her technician "will help us recognize damage to axons" (5-ER-732). Axons "are the fibers that are a product of every single nerve cell that we have in our body, and they're the wires that … connect with

the other nerve cells in the nervous system. (*Id.*) "Axonal injury in certain areas tells us what forces may have been involved in producing the trauma to the brain," and "occurs right at the time of the trauma." (5-ER-733.) Axonal injury in the corpus callosum or brain stem "is classical for angular acceleration injury" and is "quite uncommon," but was found in W.F.'s spinal cord. (5-ER-735.)

Dr. Rorke-Adams made six diagnoses: (1) "acute cardiorespiratory collapse of previously healthy 31-month old boy": (2) "multiple external injuries"; (3) "tear of ligament of Treitz"; (4) "bilateral acute subdural hematomas"; (5) "bilateral retinal and subretinal hemorrhages and papilledema," and (6) "primary acute deep cerebral, cerebellar brain stem and spinal cord contusions/lacerations with axonal injury, secondary to angular accelerations forces." (5-ER-741.) However, only the sixth diagnosis – "primary acute deep cerebral, cerebral brainstem and spinal cord contusions/laceration with axonal injury, secondary to angular accelerations forces" – involved any information from the staining completed by her lab technician. (*Id.*) Discussing her sixth diagnosis, Dr. Rorke-Adams opined that W.F. "was subjected to severe angular acceleration forces and died as a consequence." (5-ER-741-42.) She also opined that when emergency personnel arrived at Stanfield's house, W.F. had "already suffered a central nervous system damage" to his "brain stem," and that her findings confirmed the other doctors' findings of a brain stem injury. (5-ER-742.)

26

B.    United States Supreme Court Decisions Regarding the Confrontation Clause

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST, amend VI. "[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (quotes, citations, emphasis omitted). While affirming the importance of face-to-face confrontation with witnesses," the Court explained, "we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers," which "must also be interpreted in the context of the necessities of trial and the adversary process." *Id.* at 849-50.

Prior to Stanfield's trial, the Supreme Court reexamined its Confrontation Clause analysis from O*hio v. Roberts*, 448 U.S. 46 (1980). *Crawford*, 541 U.S. at 42. Examining the text of the Confrontation Clause, the Court concluded, "It applies to witnesses against the accused – in other words, those who bear testimony. Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (quotes and citations omitted). The Court explained:

> Various formulations of this core class of testimonial statements
> exist: *ex parte* in-court testimony or its functional equivalent—that is,

27

material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (quotes, citations, ellipsis omitted).

Finally, the Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 52-53. However, the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" but concluded "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68 (footnote omitted). Nevertheless, the Court reaffirmed that "[t]he Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9 (citing omitted).

*Davis v. Washington*, 547 U.S. 813, 817-21 (2006), involved two cases that addressed when police interrogations are testimonial. The Court was again unwilling to produce an exhaustive list of all conceivable "testimonial statements," but "expanded upon the meaning of 'testimony'" discussed in *Crawford*:

28

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.*

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quotes and citations omitted), involved documents admitted at trial that were prepared by an analyst who did not testify, were "declarations of facts written down and sworn to by the declarant before an officer authorized to administer oaths" regarding the weight and substance of the contents of plastic bags. The Court concluded the documents were testimonial because they were "quite plainly affidavits" that were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" particularly since "under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* at 310-11 (quotes and citations omitted).

In *Michigan v. Bryant*, 562 U.S. 344, 359 (2011) (quotes and citation omitted), the Court addressed victim statements made to police shortly before death and clarified "what *Davis* meant by the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." The Court explained that when

29

"the primary purpose of an interrogation is to respond to an ongoing emergency, its purpose is not to create a record for trial and thus is not within the scope of the Clause." *Id.*, at 358. However, "whether an ongoing emergency exists is simply one factor–albeit an important factor–that informs the ultimate inquiry regarding the primary purpose of an interrogation." *Id.* at 366. The Court recognized "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 358 (emphasis in original). Addressing the "primary purpose determination," the Court explained that "standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 358-59 (footnote omitted). In determining whether a statement is nontestimonial, "we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* at 359.

In *Bullcoming*, 564 U.S. at 652, the Court addressed a question that was raised in *Melendez-Diaz*, "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification–made for the purpose of proving a particular fact–through the in-court testimony of a

scientist who did not sign the certification or perform or observe the test reported in the certification."

To determine Bullcoming's blood alcohol concentration ("BAC"), the police sent a sample of his blood to the New Mexico's Scientific Laboratory Division ("SLD"), where a report was completed by the forensic scientist assigned to test Bullcoming's blood sample. *Id.* at 653. However, on the day of trial, the state announced it would not be calling the analyst as a witness because he had "very recently been put on unpaid leave." *Id.* at 655. Rather, the state called another "SLD scientist who had neither observed nor reviewed Caylor's analysis," to testify regarding about the report as a "business record." *Id.* at 655. Over Bullcoming's objection, the court permitted the scientist to testify and admitted the SLD report as a business record. *Id.* at 656.

The Supreme Court concluded the report was testimonial, explaining, "[i]n all material respects [it] resembles those in *Melendez-Diaz*" because "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," the analyst "tested the evidence and prepared a certificate concerning the result of his analysis," the "certificate [was] 'formalized' in a signed document headed a 'report,'" and the report form "contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses," *id.* at 665 (quotes and citations omitted). Based

31

upon the specific facts in *Bullcoming*, the Court also rejected the notion that "surrogate testimony of the kind [the second analyst] was equipped to give could not convey what [the first analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed." 564 U.S. at 661 (footnote omitted). The Court also rejected the assertion that the second analyst's role was a mere scrivener who simply "transcribed the result generated by the gas chromatograph machine, presenting no interpretation and exercising no independent judgment." *Id.* at 659-661 (quotes and brackets omitted).

Importantly, Justice Sotomayor, who provided the fifth vote, explained, "this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence" because "[w]e would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." *Id.* at 673 (Sotomayor, J., concurring).

*Williams*, 567 U.S. 50, abrogated in part by *Smith v. Arizona*, 602 U.S. 779 (2024), is the final Supreme Court opinion issued by the Supreme Court prior to the Idaho Supreme Court's decision. Justice Alito was the author of the primary opinion, joined by Chief Justice Roberts and Justices Kennedy and Breyer, *id.* at 55, and

addressed the unanswered question discussed in Justice Sotomayor's concurrence in *Bullcoming*. *Williams*, 567 U.S. at 69.

*Williams* involved an expert witness, Sandra Lambatos, who "testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood." 567 U.S. at 56. She explained that "it is a 'commonly accepted' practice within the scientific community for 'one DNA expert to rely on the records of another DNA expert.'" *Id.* at 60. She further testified "that she did not conduct or observe any of the testing on the vaginal swabs, and that her testimony relied on the DNA profile produced by Cellmark." *Id.* at 62.

In Justice Alito's plurality opinion, four Justices initially concluded the Confrontation Clause did not apply to Lambatos's testimony because it was not admitted for the truth of the matter asserted but "to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record." *Id.* at 78. Justice Thomas disagreed, concluding Lambatos's testimony was hearsay because it was offered for the truth of the matter asserted. *Id.* at 1094-09 (Thomas, J., concurring). Four dissenting Justices agreed with Justice Thomas that Lambatos's testimony was hearsay because it was offered for the truth of the matter asserted. *Id.* at 125-33.

The plurality then applied the principles discussed above to conclude that, viewed "objectively," the DNA report "was not prepared for the primary purpose of accusing a targeted individual" and did not violate the Confrontation Clause, *id.* at 84, because such reports provide "no prospect of fabrication and no incentive to produce anything other than a scientifically sound and reliable profile." *Id.* at 85 (quotes and citation omitted). The Court noted it was "significant that in many labs, numerous technicians work on each DNA profile" and "[w]hen the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Id.*

Concurring with the plurality, Justice Breyer noted that barring admission of the DNA report could "bar the admission of other reliable case-specific technical information such as, say, autopsy reports." *Id.* at 97 (Breyer, J., concurring). "What is to happen if the medical examiner dies before trial? Is the Confrontation Clause effectively to function as a statute of limitations for murder?" *Id.* at 98 (quotes and citations omitted).

Justice Thomas explained his conclusion was based upon the report lacking the "requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause." *Id.* at 103-04 (Thomas, J., concurring).

Justice Kagan, joined by Justices Scalia, Ginsburg, and Sotomayor, dissented and rejected the plurality's conclusion that the DNA report was "not prepared for

34

the primary purpose of accusing a targeted individual." *id.* at 135 (Kagan, J. dissenting), but opined the case was governed by *Melendez-Diaz* and *Bullcoming*, *id.* at 135-38. The fractured nature of *Williams*, and five justices appearing to have disagreed with the plurality (Justice Thomas and the four dissenting Justices), led Justice Kagan to conclude that the "five Justices who control the outcome of today's case agree on very little" and have "left significant confusion in their wake." *Id.* at 141. Justice Kagan continued:

> What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is – to be frank – who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

*Id.*

Stanfield cites *Smith*, 602 U.S. 779, but concedes "it is not itself the relevant clearly established law" because it was decided long after the Idaho Supreme Court had adjudicated her case. (Brief, p.19.) Nevertheless, Stanfield contends "it has bearing on the issue because of what it says about the clearly established law before 2015." (Id.) Stanfield is wrong. Under AEDPA, clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Lockyer*, 538 U.S. at 71-72 (emphasis added). As further explained in *Pinholster*, 563 U.S. at 182 (quotes and citation omitted), "Our cases emphasize that review under § 2254(d)(1) focuses on what a state court

35

knew and did. State-court decisions are measured against this Court's precedents as of the time the state court renders its decision." Because the Idaho Supreme Court would not have known what *Smith* allegedly "says about the clearly established law before 2015" (Brief, p.19), it has no bearing on this case. Irrespective, the Court dealt only with the question of whether the expert's testimony constituted hearsay and remanded to the Arizona Court of Appeals the question of whether it was "testimonial." *Smith*, 602 U.S. at 801.

C.     The Idaho Supreme Court's Decision

The Idaho Supreme Court meticulously discussed the Supreme Court's Confrontation Clause jurisprudence, comparing the facts and legal principles in *Crawford*, *Davis*, *Bryant*, *Melendez-Diaz*, *Bullcoming*, and *Williams*. (3-ER-167-73.) The court acknowledged the fractured nature of *Williams* and explained that where "no single rationale commands the support of a majority, 'the holding of the court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (3-ER-171-73 (quoting *Marks v. U.S.*, 430 U.S. 188, 193 (1977)). The court recognized, "Because no position received support from a majority of the justices, *Williams* does not provide us a governing legal principle and this Court views the decision as limited to the unique set of facts presented in that case." (3-ER-173.) The court then reasoned:

36

The facts presented by this appeal differ from both *Melendez-Diaz*, which involved a certified report that was admitted without live testimony, and *Bullcoming*, which involved a signed report that was admitted through surrogate testimony of another analyst who had no connection to the report and offered no independent expertise. *Melendez-Diaz*, 557 U.S. 305; *Bullcoming*, [564 U.S. 647]. Indeed, the facts appear to fall within one of the scenarios identified by Justice Sotomayor as being outside the "limited reach" of the majority opinion in *Bullcoming*.

(3-ER-174.)

The court noted that "[c]ircuit courts and state courts have disagreed as to the proper application of current Supreme Court Confrontation Clause jurisprudence," (3-ER-174) (citing cases), and that "[t]he only consistent requirement that can be distilled from these decisions is that in order for a statement–forensic or otherwise– to be deemed testimonial, it must have been made with a primary objective of creating an evidentiary record to establish or prove a fact at trial" (*id.*). After discussing Idaho precedent and cases from other jurisdictions (3-ER-174-76), the court joined "the majority of jurisdictions considering this subject and focus[ed its] attention on the question whether the primary purpose of the lab technician's act of labeling the slides and the implicit assertion that the proper stain was applied was intended to establish some fact at trial and whether Dr. Rorke-Adams served as a mere conduit" (3-ER-176).

The court discussed Dr. Rorke-Adams's testimony (3-ER-177-78), and noted that, while she did not observe the technician preparing the slides, she was still able

37

to determine if the correct stain had been applied (3-ER-1). The court found that "Dr. Rorke-Adams had personal knowledge that the slides were stained correctly based on her comparison of the slides with the control slide. Based upon this testimony, Dr. Rorke-Adams did not rely upon an implied assertion by the technician that the slide had been properly prepared." (3-ER-178.) Concluding that Dr. Rorke-Adams's "assertions were not made for an evidentiary purpose and thus were not testimonial, the court reasoned, "there was no Confrontation Clause violation because the technician's assertions were not made for an evidentiary purpose and thus were not testimonial. (3-ER-179.)

The court also concluded that Dr. Rorke-Adams's testimony was not inadmissible hearsay. Relying upon federal and Idaho rules of evidence, the court explained that an expert witness is allowed to base an opinion on: "(1) facts within [her] personal knowledge; (2) facts presented to [her] at trial; or (3) facts presented to [her] outside court, but not perceived by [her] personally, if those facts are the type of facts reasonably relied upon by experts in [her filed in drawing such conclusions." (3-ER-179-80.) The court also discussed the history and purpose of those rules of evidence, and Idaho precedent interpreting those rules. (3-ER-180-82.) Ultimately, the court concluded Dr. Rorke-Adams's testimony was not inadmissible hearsay. (3-ER-182.)

D.   There Is No Clearly Established Supreme Court Precedent to Resolve Stanfield's Confrontation Clause Claim

Based especially upon the fractured nature of *Williams*, and Justice Sotomayor's concurrence in *Bullcoming*, there is no *clearly established* Supreme Court precedent that resolves Stanfield's case. The Supreme Court has repeatedly explained that "clearly established law" under § 2254(d)(1), "signifies 'the holdings, as opposed to the dicta, of [the Supreme Court's] decisions.'" *Howes v. Fields*, 565 U.S. 499, 505 (2012) (quoting *Williams*, 529 U.S. at 412); *see also Richter*, 562 U.S. at 101 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)) ("'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'"); *Yarborough*, 541 U.S. at 661; *Lockyer*, 538 U.S. at 73. The Supreme Court has even rejected the "unreasonable-refusal-to-extend concept," explaining that, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (quotes and citations omitted). As explained in *Carey v. Musladin*, 549 U.S. 70, 76 (2006), the fact that "lower courts have diverged widely" on the question presented "[r]eflect[s] the lack of guidance from this Court" and supports a finding of no clearly established law as determined by the Supreme Court. And as noted by the Idaho Supreme Court, there

39

is clearly a wide divergence on the question Stanfield presented to the state courts. (3-ER-173 n.6.)

Moreover, while circuit cases "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established,'" *Duhaime*, 200 F.3d at 600, "the Supreme Court has been clear: circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Fauber v. Davis*, 43 F.4th 987, 1007 (9th Cir. 2022) (quotes and citation omitted). "When determining what is clearly established federal law, we are not permitted to frame Supreme Court precedents at a high level of generality; otherwise, we could transform even the most imaginative extension of existing case law into clearly established Federal law, as determined by the Supreme Court." *Grim v. Fisher*, 816 F.3d 296, 304-05 (5th Cir. 2016) (quotes and citation omitted); *see also Fauber*, 43 F.4th at 1007-08.

In *Flournoy v. Small*, 681 F.3d 1000, 1004 (9th Cir. 2012), this Court addressed the admissibility of an expert's testimony based on tests and reports from other lab employees. After examining Supreme Court precedent, the Court concluded, "there does not appear to be clearly established federal law that would make the admission of Rogala's testimony unreasonable under the standard set under

AEDPA." *Id.* at 1004-05; *see also Grim*, 816 F.3d at 298-99 (there is no clearly established Supreme Court precent barring admission of a "forensic laboratory report containing a testimonial certification of an analyst – made for the purpose of proving a particular fact – through the testimony of a technical reviewer who verified the analyst's findings, agreed with a reasonable degree of scientific certainty with the analyst's examinations and the results of the analyst's report, and signed the certification").

Likewise, in *Meras v. Sisto*, 676 F.3d 1184, 1187-90 (9th Cir. 2012), this Court concluded there was no clearly established Supreme Court precedent on the question of the admissibility of a supervising expert testifying regarding DNA analysis performed by a different expert. *See also Peters v. Arnold*, 765 Fed. App'x 389, 390 (9th Cir. 2019) (unpublished) ("[T]he fractured decision in *Williams* [ ], did not clearly establish any Confrontation Clause principle relevant here."); *Barba v. Montgomery*, 723 Fed. App'x. 431, 432 (9th Cir. 2018) (unpublished) (noting the fractured decision in *Williams*, "and the lack of clarity in the Supreme Court's Confrontation Clause jurisprudence"); *Hill v. Virga*, 588 Fed. App'x. 723, 724 (9th Cir. 2014) (unpublished) ("The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violates the Confrontation Clause."). *See also Reed v. May*, 134 F.4th 455, 461-64 (6th Cir. 2025) (no clearly established Supreme Court Confrontation Clause holding).

41

Relying upon *Andrew v. White*, 604 U.S. 86 (2025) (per curiam), Stanfield spills considerable ink (Brief, pp.29-32) contending she "need not find a rule from the Supreme Court with that much factual specificity to be eligible for habeas relief under 28 U.S.C. §2254(d)(1)," and that "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of the Supreme Court." (Brief, p.29) (quotes and citation omitted). Stanfield's reliance upon *Andrew* is misplaced. In *Andrew*, the state introduced evidence of the defendant's sexual proclivities reaching back two decades to establish that she conspired with someone to murder her husband, *id.* at 78, and to establish her "motive and intent … to kill her husband," *id.* at 101-02 (Thomas, J., dissenting).

Andrew sought habeas relief, contending "admission of this evidence rendered the guilt and penalty phases of her trial fundamentally unfair, in violation of due process." *Id.* at 91. Affirming the district court's denial of habeas relief, the Tenth Circuit affirmed because "Andrew had failed to cite clearly established federal law governing her claim." *Id.* (quotes and citation omitted). While the Tenth Circuit acknowledged *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), which held that the "Due Process Clause provides a mechanism for relief when the introduction of unduly prejudicial evidence renders a trial fundamentally unfair," the majority believed "that had been a pronouncement, not a holding, of this Court." *Andrew*, 604 U.S. at 91 (quotes, citation, brackets omitted).

42

In its per curiam opinion, the Supreme Court discussed *Payne*, which held:

> [A] categorical bar was not necessary to protect against the risk of prejudicial testimony because "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" against the introduction of evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair." In light of that protection, the Court held it could permit victim impact evidence where appropriate without risking undue prejudice to defendants."

*Id.* at 92-93 (quoting *Payne*, 501 U.S. at 825). Because the "legal principle on which Andrew relie[d]" – the Due Process Clause – was "indispensable to the decision in *Payne*," the Court concluded "it was a holding of this Court for purposes of AEDPA." *Id.* at 93.

There is a stark difference between a due process claim as discussed in *Andrew* and *Payne*, and the Confrontation Claim that is being raised by Stanfield. *Andrew* involved a general due process rule. However, based upon *Crawford* and its progeny that have failed to ascertain a rule the governs the claim Stanfield makes, *Andrew* remains inapposite. *Cf. White v. Illinois*, 502 U.S. 346, 352 (1992) (quotes and citations omitted) ("[W]e have been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements"); *see also Reed*, 134 F.4th at 463-64. Regardless, based upon the confusing nature of *Williams*, there is nothing that constitutes a "holding" that binds state courts. Consequently, even if *Crawford* and its progeny establish a "general rule," it is not broad enough to encompass Stanfield's claim and arguments.

43

Finally, Justices Gorsuch and Sotomayor have recognized the confusion that has resulted from *Crawford* and its progeny. In *Stuart v. Alabama*, 586 U.S. 1026, 1027 (2018) (Gorsuch, J., dissenting from the denial of certiorari), the Court was asked to review the question of whether a forensic report not authored by the testifying expert was not offered for the truth of the matter asserted but provided the basis testifying expert's testimony. *Id.* Justice Gorsuch concluded, "the problem appears to be largely of our creation," and, after discussing *Williams* and several other cases, explained that "[t]his case supplies another example of that confusion." *Id.* Ultimately, Justice Gorsuch concluded, "I believe we owe lower courts struggling to abide our holdings more clarity that we have afforded them in this area."

Certainly, if Justices Gorsuch and Sotomayor recognize the confusion that *Williams* has created and, at least implicitly, concluded there is no clearly established Supreme Court holding that governs the introduction of forensic reports akin to this case, then this Court should likewise conclude there was no clearly established Supreme Court holding governing this case when the Idaho Supreme Court issued its decision. Because there is no clearly established Supreme Court holding that barred the admission of Dr. Rorke-Adams's testimony regarding the creation and staining of the slides by her technician, the Idaho Supreme Court's decision cannot be an unreasonable application of Supreme Court precedent, and Stanfield's Confrontation Clause claim fails.

E.   The Idaho Supreme Court's Decision Was Not an Unreasonable Application of Supreme Court Precedent[2]

Even if clearly established Supreme Court precedent existed, Stanfield's claim fails. Initially, the district court erred by "assuming" the Idaho Supreme Court's decision was objectively unreasonable when it opined that "it is clearly established that underlying scientific testing and results are always offered for the truth of the matter and therefore always hearsay." (1-ER-17) (emphasis omitted). Indeed, the court failed to even address the Idaho Supreme Court's analysis that was based upon Fed. R. Evid. 703, comment 1; Fed. R. Evid. 602; and I.R.E 602; and I.R.E. 703.[3] (3-ER-180.)

Relying upon those rules, the Idaho Supreme Court explained that "Dr. Rorke-Adams'[s] conclusions were based in small part on the labeling created by the technician. … Dr. Rorke-Adams did not testify concerning observations made by another expert but rather explained why she could conclude that the slides belong to

---

[2] Stanfield also contends the Idaho Supreme Court "made an unreasonable finding of fact along the way." (Brief, p.21.) However, she fails to articulate any "fact" that was unreasonably determined by the Idaho Supreme Court. Therefore, Stanfield has waived or forfeited any aspect of § 2254(d)(2). The State cannot address the argument because of Stanfield's failure to explain what facts were unreasonably determined by the Idaho Supreme Court.

[3] As explained by the Idaho Supreme Court, "The Idaho Rules were modeled on the Federal Rules of Evidence in order to obtain uniformity in the trial practice in both the state and federal courts." (3-ER-180 n.10) (quotes and citation omitted).

45

W.F. and why she could observe the amyloid antigens in W.F.'s tissue." (3-ER-182.)

The Court further reasoned:

> [T]he technician here did not make any factual findings. Dr. Rorke-Adams did not relay any conclusions that were drawn by the technician. Rather, it was Dr. Rorke-Adams who conducted the examination of the tissue, documented her factual findings, and formed her opinion. Thus, we find that Dr. Rorke-Adams did not act as a conduit for inadmissible hearsay, but rather indicated the "general nature of the sources" she relied on in forming her opinion as permitted by I.R.E. 703.

(3-ER-182.)

Admittedly, the district court tried to rely upon the fractured opinions in *Williams*. (1-ER-16-17.) However, based upon the fractured nature of *Williams*, it is difficult to conclude there was any "holding" that prevented Dr. Rorke-Adams from explaining "why she could conclude that the slides belonged to W.F. and why she could observe the amyloid antigens in W.F.'s tissue." (3-ER-182.) Moreover, *Williams* did not address the rules of evidence addressing expert testimony upon which the Idaho Supreme Court relied. Consequently, even if there was a clearly established holding from the Supreme Court that held the technician's work in this case constituted hearsay (which the State denies), the Idaho Supreme Court's decision was not an unreasonable application of that holding. *See Reed*, 134 F.4th at 460-61 (discussing why non-testifying confidential informant was not testimonial).

Addressing whether the work completed by the technician was testimonial, the district court again "assum[ed] that *Crawford*'s progeny (prior to *Williams*)

46

clearly established that the out-of-court lab work results ordered for the investigation or prosecution purposes in the same case are testimonial (even though by 2024, that was still unresolved by the United States Supreme Court)." (1-ER-21) (emphasis omitted, parenthesis in original). Exactly how *Crawford* and its progeny clearly established that the lab technician's work was testimonial when the district court conceded, "even though by 2024, that was still unresolved by the United States Supreme Court" (1-ER-21), is a complete mystery. Either the question was resolved or it wasn't. Nevertheless, the court reasoned that the Idaho Supreme Court's application of *Crawford* and it progeny, including *Williams*, was not objectively unreasonable under AEDPA. (1-ER-22-29.)

Stanfield has failed to establish a Confrontation Clause violation, let alone that the Idaho Supreme Court's decision was objectively unreasonable. The Supreme Court "has repeatedly explained that, when it comes to AEDPA, the more general the federal rule, the more leeway state courts have in reaching outcomes in case-by-case determinations before their decisions can be fairly labeled unreasonable." *Brown v. Davenport*, 596 U.S. 118, 144 (2022) (quotes, citations, ellipsis, brackets omitted). Because Stanfield's extension of *Crawford* would constitute a general rule, and based upon the State's argument in the prior section, the Idaho Supreme Court had great leeway when determining whether a Confrontation Clause violation occurred under the facts of her case. Even under de novo review her claim fails.

47

First, there is no evidence establishing that police were involved in having Dr. Rorke-Adams examine W.F.'s brain and spinal cord, let alone having the technician complete the slides and stains. Rather, the decision was made by either Dr. Garrison and/or the prosecutor. (3-ER-655-66, 746.) Second, the purpose of sending W.F.'s brain to Dr. Rorke-Adams was not to gather evidence to establish Stanfield was W.F.'s killer but to determine what caused his death. Third, the lab technician's work was not done to accuse a targeted individual, especially since the technician had no information regarding Stanfield having been charged. In other words, the work completed by the technician did not involve "statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Williams,* 567 U.S. at 82. Fourth, the lab technician's work did not involve "formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id.* Rather, as explained by Dr. Rorke-Adams, the lab technician merely provided

> documentation to the fact that she received the tissue, the stain that we requested her to do, and she notes when she did it, and then when she handed it back to us. Those are the only pieces of documentation. This is the standard procedure in the laboratory for every case.
>
> And so the label of the material is attached to the material. It remains with the material. Then the slides are prepared by the technician and the slides are labeled with the same number that was attached to that specimen so we know that Specimen 500 came from John Smith. And so we evaluate – we evaluate it, write a report, and that report goes into the permanent record.

(5-ER-726.)

48

Fifth, there is no evidence establishing that examination of W.F.'s brain was done pursuant to state statute. Sixth, there was nothing in the lab technician's work that directly linked Stansfield as the perpetrator of a particular crime. Seventh, while Dr. Rorke-Adams did not personally observe the technician prepare the slides, she explained how she was able to determine if the correct stain was properly applied:

> [T]here's always a control slide that goes with it. Control slide means that -- in this particular case, I asked for a specific antibody to be applied to this tissue.
>
> ****
>
> We fill out a request sheet. We ask specifically for that antibody to be applied to the tissue. It's given to the technician along with the specimen. The technician then knows which antibody to use. Those technical procedures are done in that special laboratory.
>
> And then that prepared slide is given to the pathologist along with the sheet, the request sheet that we made out asking for antibody, plus a control slide, which means that another piece of tissue that was known to contain this particular antigen that we're interest in has been used to corroborate the validity of the stain from the unknown slide.
>
> So we look at the control slide first to make certain that the technique was working so that we can rely then upon what we're looking at in the unknown slide.
>
> So these are all standard procedures in the laboratory, and this is the way it is done every day for all of the cases that come through.

(5-ER-727.)

Finally, Dr. Rorke-Adams explained the purpose of the staining (5-ER-732-33), discussed axonal injuries in the brain stem and spinal cord generally (5-ER-733-

49

35), explained that, reviewing the slides, she found axonal injuries in W.F.'s spinal cord, medulla, and brain stem (5-ER-735-41), and offered her opinion – the sixth diagnosis – that was based *only in part* on the slides provided by the technician – "primary acute deep cerebral, cerebellar brain stem and spinal cord contusions/lacerations with axonal injury, secondary to angular acceleration forces" (5-ER-741). Dr. Rorke-Adams explained that her finding of contusions was based upon her examination of "microscopic sections, and that "secondary to angular acceleration forces" meant "[t]hat this injury to the nervous system was produced by these forces in which this child's head was violently rotated or hyperextended with sufficient force to tear these fibers and produce the damage." (*Id.*)

Stanfield's case is less compelling than *Grim*, where a forensic scientist was permitted to testify regarding the testing of cocaine completed by another analyst. 816 F.3d at 299. The testifying scientist discussed the procedures followed by the other analyst, explained that the report completed by the other analyst was reviewed by a "technical reviewer" who "ensures that the analyst did proper examinations, that the analyst's interpretation of the results of the examinations is correct, that the conclusion of the analyst from the collective examinations is correct, and that the conclusion is conveyed in an understandable manner in the report." *Id.* The testifying scientist explained he did not analyze the cocaine but took procedures to ensure the non-testifying analyst had done proper testing. *Id.* at 299-300.

50

After reviewing Supreme Court and federal circuit precedent, *id.* at 305-10, the Fifth Circuit concluded the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court, *id.* at 310. While the court focused upon the lack of Supreme Court precedent, it recognized that "Frazure examined the analyst's report and all of the data, including everything the analyst did to the item of evidence; ensured that the analyst did the proper tests and that the analyst's interpretation of the test results was correct; ensured that the results coincided with the conclusion in the report; agreed with a reasonable degree of scientific certainty with the examinations and results of the report; and signed the report." *Id. See also Jenkins v. Hall*, 910 F.3d 828, 834-35 (5th Cir. 2018) (discussing and reaffirming *Grim*).

In *Washington v. Griffin*, 876 F.3d 395, 400-02 (2nd Cir. 2017), a criminalist, who did not perform all the tasks associated with obtaining a DNA profile, testified regarding a swab taken to obtain a profile. Washington raised a Confrontation Clause claim because the analysts who generated the DNA profile and made notations in the file did not testify. *Id.* at 403. The Second Circuit concluded, "the Supreme Court has never held that the Confrontation Clause requires an opportunity to crossexamine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations of the sort at issue here are testimonial." *Id.* at 404-07. After examining *Williams*, the

51

court reasoned, "Washington fails to show that reasonable jurists would all agree as to the narrow rule to be drawn from the plurality opinion." *Id.* at 409. The court recognized, "the plurality opinion at no point affirms that in the 'targeted suspect scenario,' the Confrontation Clause necessarily applies." *Id.* at 410. Finally, the court explained:

> As to DNA testing in particular, the plurality also deemed it significant that when the work of a lab is divided up among a number of analysts, the likelihood is that the only purpose of each analyst is to perform his or her task in accordance with accepted procedures—at least suggesting that in such circumstances, the primary purpose of out-of-court notations may not be testimonial, regardless whether a suspect has been identified. The use at trial of a DNA report prepared by a modern, accredited laboratory, … bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.

*Id.* at 410 (brackets, quotes, citations omitted); *see also Garrett v. Madden,* 859 Fed. App'x. 156, 158 (9th Cir. 2021) (unpublished) ("[w]e find fair-minded jurists could disagree about whether admitting the challenged evidence violated clearly established federal law, especially given substantial ambiguity in this area."); *Jimenez v. Allbaugh*, 702 Fed. App'x. 685, 688 (10th Cir. 2017) ("[O]pinion testimony will not violate the Confrontation Clause when the testifying expert provides an independent judgment, even if the testimony is in some part based on inadmissible evidence.").

Stanfield contends there is "a reasonable interpretation of the record [ ] that the lab technician, and not Dr. Rorke-Adams, also prepared the control slide for comparison." (Brief, p.26.) Stanfield's contention is not supported by the record:

> Q. [Prosecutor]: Are you able to tell when your technician places the stain on these tissues where the stain has been properly applied or not?
>
> A. Yes. Because there's always a control slide *that goes with it*….
>
> ****
>
> We fill out a request sheet. We ask specifically for that antibody to be applied to the tissue. It's given to the technician along with the specimen. The technician then knows which antibody to use. Those technical procedures are done in that special laboratory.
>
> And then that prepared slide is given to the pathologist along with the sheet, the antibody, plus a control slide, which means that another piece of tissue that was known to contain has been used to corroborate the validity of the stain from the unknown slide.
>
> So we look at the control slide first to make certain that the technique was working so that we can rely upon what we're looking at in the unknown slide.

(5-ER-727) (emphasis added).

Clearly, the technician did not create the control slide because it went with the request sheet and the specimen that would be stained. "We," presumably meaning Dr. Rorke-Adams, then looks at the control slide to determine whether the stain has been properly applied to the tissue. Even Stanfield concedes, that at best, "[i]t is not clear whether the control [slide] was created from scratch by the technician, bought

53

commercial, or obtained in some other way." (Brief, pp.26-27.) If the origin of the control slide is "not clear," the Idaho Supreme Court's reliance upon the slide cannot be objectively unreasonable. (*See* 3-ER-178.)

In Stanfield's case, the lab technician did not complete a report or interpret any of the "data" from the slides. Nevertheless, as explained above, using the control slide Dr. Rorke-Adams was able to ensure the technician properly completed the task asked of her using the correct stain. All the facts in Stanfield's case distinguish the Supreme Court cases discussed above. Irrespective, Stanfield has failed to establish that the Idaho Supreme Court's decision was an objectively unreasonable application of Supreme Court holdings. Even under de novo review her claim fails because the information from the lab technician was neither hearsay nor testimonial.

F.    Any Alleged Error is Harmless

Harmless error has been applied in Confrontation Clause cases, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Morales v. Woodford*, 388 F.3d 1159, 1180 (9th Cir. 2004). In habeas, "petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quotes and citation omitted). "[R]elief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at

267-68 (quotes and citation omitted). This involves more than a "'reasonable possibility" that the error was harmful." *Id.* at 268 (quotes and citation omitted).

Initially, as detailed above, multiple other experts testified that W.F. died from abusive head trauma, not an accidental injury as alleged by Stanfield. While Dr. Hilvers did not opine that W.F. had abusive head trauma, based upon W.F.'s neurologic presentation Dr. Hilvers was "concerned about brain injury." (5-ER-768.) Based upon "cumulative signs" that included "bruising, the extensive retinal hemorrhages, the bleeding in his head, the subdural hemorrhages, the progressive brain swelling, … just horrible neurological exam with minimal brain stem function," Dr. Jansen opined that W.F. died from "abusive head trauma," and that his injuries could not be caused by falling over and hitting his head on a carpeted surface or becoming angry and throwing himself to the ground and striking his head on a carpeted surface as alleged by Stanfield. (5-ER-487.) Dr. Cherny rendered the same expert opinion. (5-ER-512-13.) Dr. Fishborn opined the retinal hemorrhages in W.F.'s eyes "showed severe trauma," "would be a significant form of nonaccidental injury," could be "a finding of shaken baby syndrome," and explained he had never seen those types of hemorrhages "from a little boy who ha[d] fallen from [ ] 34-1/2 inches" as alleged by Stanfield. (4-ER-397-98, 401-02.) Based upon a high degree of medical certainty," Dr. Sexton opined that W.F. "was the victim of physical abuse, having "suffer[ed] abusive head trauma." (6-ER-928-29.) Dr. Bell

rejected Stanfield's accidental injury stories and explained, "this was caused by abusive head trauma" (4-ER-428). Dr. Crawford opined that his findings were consistent with abusive head trauma involving "repetitive acceleration-deceleration forces." (4-ER-453.) Finally, Dr. Garrison opined that W.F. was "[a]n abused child" (5-Er-644), who died from "blunt force trauma to the head secondary to the actions of another person" (5-ER-629).

Dr. Rorke-Adams's testimony was merely icing on the cake that further corroborated seven other experts who all concluded W.F. did not die from an accident but died as a result of abusive head trauma. Further, only the sixth diagnosis involved reviewing the stained slides, which showed "axonal injury, secondary to angular acceleration forces" (5-ER-741), which had no bearing on the question of whether W.F. died from abusive head trauma. Dr. Rorke-Adams agreed that she was "able to see the laceration and contusions using [her] special staining *as well as* a microscopic exam." (5-ER-761) (emphasis added).

Additionally, the multiple, changing stories by Stanfield regarding how W.F. was injured that are described above were unaffected by Dr. Rorke-Adams's testimony involving the stained slides. Importantly, Stanfield instructed Lance to "take [his] time" getting to an interview with Detective Vucinich, and that she was going to a hotel to avoid being arrested (6-ER-970-71), and conceded that she parked her car behind the hotel so "nobody could find her" (5-ER-970). In Idaho,

"Evidence of flight, escape, or failure to appear on the part of a defendant is often identified as relevant to demonstrate consciousness of guilt." *State v. Moore*, 965 P.2d 174, 179 (Idaho 1998) (quotes and citation omitted) (whether evidence is sufficient to indicate that flight occurred is a question that should be left to argument to the jury by the parties). The same is true in the Ninth Circuit. *See U.S. v. Harris*, 792 F.2d 866, 869 (9th Cir. 1986) ("Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself.").

Further W.F.'s injuries seen by EMTs at the house, and Stanfield's stories and demeanor, were not consistent with an accident. (4-ER-313-14, 315, 327, 339, 369, 376-78, 386-90; 5-ER-555, 602-03; 6-ER-859-60, 865, 872) Chaplain Carla Nielsen explained that, even after the decision to terminate life support was made, Stanfield showed no emotion nor was "acting at all bereaved," which was totally different from the 100's of childrens' deaths Nielsen had attended. (6-ER-985, 987.)

Stanfield's stories about W.F.'s physical abilities and health were not even consistent with W.F.'s treating physician's observations, who testified he had "absolutely no concerns" regarding W.F (5-ER-675-76), and did not observe any equilibrium concerns at W.F.'s last well-baby check on November, 10, 2000 (5-ER-678-79). W.F.'s prior babysitter also disputed Stanfield's contentions regarding W.F.'s behavior and physical abilities (5-ER-716), as did a babysitter that "filled in" (5-ER-781; 6-ER-785-86). W.F.'s great-grandmother agreed he had no equilibrium

or other issues as Stanfield claimed. (5-ER-595-98.) Lance agreed that W.F. had no equilibrium problems. (6-ER-966, 984.) W.F.'s paternal grandmother agreed that W.F. did not have equilibrium problems and was not "clumsy." (7-ER-1126-27, 1134.)

Stanfield's stories and testimony were also inconsistent with C.D.'s testimony that he went to the bathroom after asking for a snack, shut the door, and then heard the thump as he was "heading back" to the kitchen, and he had never told anyone before that he was in the kitchen with Stanfield when he heard the thump. (6-ER-891.) Importantly, Stanfield had a telephone conversation with Stacie, instructing her that "[C.D.] needs to be honest and tell the truth where he was, because he was right there." (7-ER-1315.) She further stated, "It doesn't look good for me if [C.D.] said he was out of the room in the bathroom." (7-ER-1318.)

Stanfield's testimony was also inconsistent with J.D.'s testimony, who explained that he was in a different room when W.F. was injured and did not see him fall, and C.D. was in the bathroom at the time. (7-ER-1115-15, 1161.)

When all the other evidence establishing Stanfield's guilt is considered, Dr. Rorke-Adams's testimony regarding the stained tissue did not have a substantial and injurious effect or influence on the jury's verdict. Consequently, Stanfield is not entitled to habeas relief.

58

## **CONCLUSION**

The State respectfully requests that this Court affirm the judgment of the district court.

DATED this 22nd day of December, 2025.

/s/ *L. LaMont Anderson*
L. LaMONT ANDERSON
Lead Deputy Attorney General
Capital Litigation Unit

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-2607

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/L. LaMont Anderson | **Date** | Dec 22, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2607

I am the attorney or self-represented party.

**This brief contains** | 13,981 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/L. LaMont Anderson | **Date** | 12/22/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY That on or about the 22nd day of December, 2025, I caused to be served a true and correct copy of the foregoing document by the method indicated below, postage prepaid where applicable, and addressed to the following:

Craig H. Durham               \_\_\_\_\_ U.S. Mail
Ferguson Durham, PLLC       \_\_\_\_\_ Hand Delivery
223 N. 6th Street, Suite 325    \_\_\_\_\_ Overnight Mail
Boise, ID 83702                \_\_\_\_\_ Facsimile
chd@fergusondurham.com       _X_ Electronic Court Filing

                        /s/ L. LaMont Anderson
                        L. LaMONT ANDERSON
                        Lead Deputy Attorney General
                        Capital Litigation Unit